IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| TIMOTHY SCOTT FREEMAN, | : | |
| | : | |
| Plaintiff, | : | CIVIL NO. 1:08-CV-00029-JEG-CFB |
| | : | |
| | : | REPORT AND RECOMMENDATION |
| vs. | : | ON DEFENDANT'S MOTION FOR |
| | : | SUMMARY JUDGMENT |
| DR. GREG THOMAS, | : | |
| | : | |
| Defendant. | : | |

This matter comes before the Court on Defendant Dr. Greg Thomas' Motion for Summary Judgment (Clerk's No. 26) and Amended Motion for Summary Judgment (Clerk's No. 35). Plaintiff, Timothy Scott Freeman, a former inmate at Pottawattamie County Jail, Council Bluffs, Iowa, and currently an inmate at Newton (Iowa) Correctional Facility, brings this action under 42 U.S.C. § 1983. Freeman claims Dr. Thomas, a physician at the Pottawattamie County Jail, violated his constitutional rights when he acted in deliberate indifference to Freeman's serious medical needs.

As grounds for summary judgment, Dr. Thomas asserts that there are no disputed material facts and that he is entitled to judgment as a matter of law.

This case was referred to the undersigned February 26, 2009, for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). This matter is fully submitted. After carefully reviewing the summary judgment record, the Court finds and respectfully recommends as follows on the issues presented.

**I. Procedural History**

Defendant Dr. Thomas filed a Motion for Summary Judgment (Clerk's No. 26) on September 1, 2009. On October 22, 2009, the Court granted Freeman's Motions to Amend his Complaint (Clerk's Nos. 31 and 32); Freeman clarified that Pottawattamie County was a defendant and stated that the relief he seeks is monetary damages. Defendants Dr. Thomas and

1

Pottawattamie County filed an Amended Motion for Summary Judgment (Clerk's No. 35) on November 16, 2009.  On February 1, 2010, Freeman filed a Stipulation of Dismissal Without Prejudice, dismissing all claims against all defendants except Dr. Thomas, and he filed a Resistance to the Motions for Summary Judgment.  Dr. Thomas filed a Reply on February 16.

## II.  Summary Judgment Standard

Summary judgment is appropriate if the facts and the reasonable inferences, viewed in the light most favorably to the nonmoving party, establish that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007); *see* Fed.R.Civ.P. 56; *Celotex Corp. v. Carrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  Reasonable inferences are "those that can be drawn from the evidence without resort to speculation." *Elam v. Regions Fin. Corp.*, No. 09-2004, 2010 WL 1526450, at *2 (8th Cir. Apr. 19, 2010) (quoting *P.H. v. Sch. Dist. of Kansas City, Mo.*, 265 F.3d 653, 658 (8th Cir. 2001)).

When a motion is made and supported as required in Federal Rule of Civil Procedure 56(a), the adverse party may not rest upon mere allegations or denials in its pleadings, but must set forth specific facts showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).

## III.  Findings of Fact

The following facts are either not in dispute or are viewed in the light most favorable to Freeman, the nonmovant.

Beginning on June 6, 2007, Freeman, then age 45, was incarcerated in Pottawattamie County Jail, where he was under Dr. Thomas' care.  The doctor had served as the jail's medical director since August 1999; he is a medical doctor licensed in the State of Iowa and practices primarily in the area of family practice.

Dr. Thomas stated in his affidavit that the jail's medical records for Freeman dated back to February 2000.  The doctor knew that Freeman's medical conditions included coronary artery disease and hypertension, or high blood pressure, "with a history of noncompliance taking anti-hypertensive oral agents." (Def.'s App. at 1.)

On June 15, 2007, Dr. Thomas ordered a prescription of the beta-blocker[1] Atenolol[2] for Freeman to treat his hypertension.  On the same date, Dr. Thomas prescribed nitroglycerin tablets for Freeman to use for his angina, or chest pains.  Freeman received nitroglycerin tablets from a prison nurse, who wrote the following instructions:  "Use one pill under tongue at onset of chest pain, then every 5 minutes as needed up to 3 pills total."  *Id.* at 20.

On June 18, 2007, Freeman experienced chest pain and, over a period of time, took three nitroglycerin tablets, but the pain continued and he collapsed in his cell.  He was taken to Mercy Hospital in Council Bluffs, where Dr. Dawn Bodner, a cardiologist with Cardiovascular Specialists, P.C., examined him.  Dr. Bodnar noted in the medical record that Freeman had a myocardial infarction in 2005 and another in 2006 and was taking cardiac medications.  The doctor also wrote that Freeman had hypertension and was taking 50 mg of Atenolol daily.  Dr. Bodnar ordered various tests for Freeman's condition.  On June 19, the doctor stated in the medical record that her plan and recommendation for Freeman included the following:  "We have not placed him on beta blocker due to significant bradycardia[3] which he may also be symptomatic to. . . .  He should continue to use sublingual nitroglycerin as needed. . . .  His chest pain has been very atypical. . . .  Will continue following along in his care and make recommendations as we go along."  (Pl.'s App. at 6.)

---

[1] The parties agree that a beta-blocker is defined as, "any of various drugs used in treating hypertension (high blood pressure) or arrhythmia (irregular heart rhythm); decreases force and rate of heart contractions by blocking beta-adrenergic receptors of the autonomic nervous system."  (Def.'s Statement Undisputed Mat. Facts Supp. Mot. Summ. J. at 1.)

[2] The parties agree Atenolol is a "beta blocker medication that blocks the action of a portion of the involuntary nervous system that stimulates the pace of the heartbeat.  By blocking the action of these nerves, Atenolol reduces the heart rate and is useful in treating abnormally rapid heart rhythms."  (Def.'s Statement Undisputed Mat. Facts Supp. Mot. Summ. J. at 1.)  Atenolol also "reduces the force of the heart muscle contraction, lowers blood pressure, and is helpful in treating angina."  *Id.*

[3] "Bradycardia," the parties agree, is "A slow heart rate, usually defined as less than 60 beats per minute. . . .  Adverse effects can be low blood pressure, fatigue, light headedness and passing out.  One can be without symptoms as well."  (Def.'s Statement Undisputed Mat. Facts Supp. Mot. Summ. J. at 2.)

On June 20, 2007, Dr. Asif Mahmood examined Freeman and found him stable enough to be discharged from the hospital. Dr. Mahmood wrote on the discharge summary that Freeman's final diagnosis ruled out a myocardial infarction, and his chest pain "was most likely musculoskeletal." *Id.* at 7. The doctor stated that Freeman's hypertension was controlled. Dr. Mahmood Freeman wrote, "The patient is being explained about the whole plan in detail, and his questions were addressed in an appropriate manner. The patient will be returned to the County Jail and will follow with Dr. Thomas for further management and care as an outpatient." *Id.*

Freeman asserts in his affidavit that when he was discharged, "I was told that I was not to take Atenolol because it was slowing my heart rate down too much." *Id.* at 1. The medical record shows that on June 21, 2007, Dr. Thomas discontinued Freeman's Atenolol prescription.

On June 26, Dr. Thomas entered an order for up to 100 mg of Atenolol twice a day for Freeman. According to Freeman, he did not know that Dr. Thomas had prescribed the Atenolol. At 6:10 p.m. that evening, a medical staff member recorded in the medical record that the inmate's blood pressure was 170/110 and "pulse" at "59-62." *Id.* at 21.

On July 2, Dr. Thomas examined Freeman and checked his blood pressure and heart rate. The doctor wrote in the medical record that Freeman was not dizzy. On July 7, a medical staff member recorded that Freeman's blood pressure was 148/94 and his heart rate was 60.

Freeman asserts that on July 11, 2007, after discovering that Dr. Thomas had prescribed Atenolol for him, Freeman filled out an inmate communication form complaining about taking the medication. Freeman stated the doctors at Mercy Hospital "took me off [Atenolol] because of my" low heartbeat rate, and the inmate indicated he had been experiencing dizziness, headaches, shortness of breath, and chest pain as a result of taking the Atenolol again. *Id.* at 16. On July 12, Freeman wrote an inmate communication to the Sheriff stating, " the heart special[i]st at Mercy that did the work on me told me I had two proble[ms] one we had to get my B[lood] P[ressure] down it was way to[o] hi[gh] and stop taking the Aten[olo]l because it slo[ws] your heart down t[o]o much." *Id.* at 18 (alterations added). Freeman wrote that the specialist "let your medical staff know to stop the Atenolol and they did," but then the jail's medical staff had resumed giving him the medication. *Id.* He complained of chest pain and shortness of breath. Freeman indicated he did not want to take the Atenolol and would refuse to take "any more pills from your nurses." *Id.* The same day, a staff member reported in medical unit notes

4

that Freeman said he was "not suppose to take" Atenolol, and the staff member "suggested he just refuse Atenolol until we work it out." *Id.* at 23.

On July 13, a medical staff member wrote in Freeman's record that he was refusing to consult with Dr. Thomas about his "medications [and] chronic cardiac condition." *Id.* at 23 (alteration added). The staff member saw Freeman shadowboxing and observed the inmate had no shortness of breath. *Id.*

On July 14, Freeman refused all medication offered to him by the nurse, stating the beta-blocker "slowed my heart down." *Id.* at 19.

On July 16, Dr. Thomas discontinued the Atenolol. The parties agree that between June 26 and July 16, 2007, jail medical staff checked Freeman's heart rate three times. Freeman stated in his affidavit that during that time, he experienced dizziness and shortness of breath, needed help balancing when he stood up, and feared his heart rate was going to drop so low that he would die.

On July 17, 2007, a medical staff member wrote in Freeman's jail medical records, "Talked to Vicki[e] in cardiology . . . . She will take the list of meds he is currently on and consult with the cardiologist for his recommendation. A letter will follow in a few days [with] an update regarding [patient] treatment recommendations." *Id.* at 24 (alterations added). A Cardiovascular Specialists office note regarding Freeman dated July 17, signed by Dr. Bodnar and dictated by Vickie Reed, a nurse, stated as follows:

> Timothy Freeman was an inpatient at Mercy Hospital with chest pain earlier this month. We have been asked to review his medical regimen. . . . His past medical regimen was adjusted and he was discharged to the correctional facility. During his hospitalization, he was significantly bradycardic. Upon admission, his complaints in addition to the chest pain were light-headedness and unstable balance with what was thought to be secondary to the bradycardia. During the hospitalization, his heart rate ranged from the mid 40s to the lower 50s. For that reason, his beta-blocker was held. At the time of discharge, his heart rate remained in the lower 50s; therefore, we continued to hold the Atenolol. The reports received today from the Pottawattamie County facility indicates [sic] that he has been placed on Atenolol starting at 50 mg daily and had been increased now to 100 mg twice a day. His blood pressure on July 17th is 158/80 with a pulse of 70. Blood pressures have continued to range in the 150s/100s. Apparently there was a complaint indicating that the patient was instructed to not take any beta-blocker. . . . [H]is Atenolol was held due to bradycardia, which does not appear now to be an ongoing problem. It is recommended that a patient

>with his underlying coronary disease maintain on beta-blocker therapy. . . . [Dr. Bodnar] does recommend that if his blood pressure and heart rate tolerates beta-blocker, this medication should be considered a necessary component of his cardiac medical regimen.  To prevent further cardiovascular complications, we recommended his blood pressure target be 120/80 and less, and maintaining a heart rate greater than 55. . . .  [W]e do recommend that he be on beta-blocker therapy, as adjusted by Dr. Greg Thomas.  The staff was instructed to check his blood pressure and pulse every other day . . . .  He has sublingual nitroglycerin, which he should keep on his person.

Def.'s App. at 18 (alterations added).

On July 20, 2007, Freeman's pulse and blood pressure were checked at the jail's medical unit.  According to an entry in his medical record, Freeman requested Atenolol, in part because his blood pressure was high.  A jail medical staff member wrote in Freeman's medical record, "Called Vicky [sic] [at] Cardiac Center to go over BP's/pulses & meds.  Recommendations were made and she stated a letter would be faxed sometime this week.  Instructed to return a call on Monday . . . & let her know how his BP & pulse are."  *Id.* at 17 (alteration added).

At the end of the Cardiovascular Specialists' office note dated July 17, Reed wrote, and Dr. Bodnar signed, the following addendum:

>A second phone call was received from the nurse at the Pot[t]awattamie County Jail . . . .  Mr. Freeman's blood pressure was 158/120 on July 18th with a pulse of 72, 158/118 with a pulse of 84 on July 19th, 184/120 with a pulse of 72 on the evening of July 19th.  He has not resumed Atenolol, and the staff and the primary care provider are concerned about his antihypertensive therapy.  They were instructed to resume Atenolol 25 mg daily, maintain a pulse of greater than 55 unless the patient is symptomatic.  They will check his blood pressure and pulse and notify us in the next 4-5 days for further recommendations.

*Id.* at 19.  On July 20, Freeman was placed on Atenolol again.  On July 24, he was released from jail on bond.

Freeman returned to Pottawattamie County Jail on January 14, 2008, for a probation violation.  Dr. Thomas ordered Atenolol for him on January 15, and discontinued it January 18. On January 29, Dr. Thomas ordered Freeman transported to Mercy Hospital for further evaluation due to his complaints of chest pain.  Freeman was examined at the hospital by Dr. Randall Pritza, a cardiologist who worked with Dr. Bodnar.  Dr. Pritza stated in his affidavit that he recommended at that time that Freeman "not initiate any beta blocker therapy due to his history of symptomatic bradycardia."  *Id.* at 5.  Freeman was released from jail on February 13.

On March 6, 2008, Freeman returned to Pottawattamie County Jail as the result of a probation violation. Dr. Thomas testified, and Freeman admits, that prison medical staff noted that Freeman was taking the prescribed nitroglycerin tablets, which he had been allowed to keep in his cell, "for heart palpitations, and on a frequent basis without notifying medical staff as instructed." (Def.'s Statement Undisputed Mat. Facts Supp. Mot. Summ. J. at 2.) Accordingly, on March 18, 2008, Dr. Thomas started a new protocol for administering nitroglycerin pills to Freeman. The doctor ordered staff to remove the nitroglycerin tablets from Freeman's cell, and he was required to request the nitroglycerin from staff when he need the medication. In his affidavit, Dr. Thomas explained his reasons for changing the protocol for administering nitroglycerin pills to Freeman:

> Nitroglycerin is used to relax the blood vessels surrounding the heart. A patient should take one pill, wait 5 minutes, take a second pill if the pain is not relieved, and take a third pill after another five (5) minutes if the pain continues. When the third pill is taken, the patient should be assessed for the possibility of a more serious condition than angina such as an acute heart attack. Therefore, a patient's use of nitroglycerin should be monitored. It is not to be used to treat heart palpitations. . . . Our medical concern with Mr. Freeman taking his nitroglycerin without necessity was severe, rapid drop in blood pressure which could cause fainting or more seriously an acute heart attack. Also, if the patient was taking nitroglycerin in an unsupervised fashion, there was no way to know if something more serious was occurring.

Def.'s App. at 1-2. Freeman testified that this change in protocol conflicted with the orders of a Mercy Hospital cardiologist, whose name he could not recall. According to Freeman, the cardiologist "prescribed nitroglycerin to be kept on my person at all times." (Pl.'s App. at 2.) Freeman further stated that after March 18, "it would take anywhere from 17 to 20 minutes to receive my nitroglycerin when I was having chest pains." *Id.*

Under the new protocol, nitroglycerin tablets available for Freeman were kept in the jail supervisors' office. A supervisor's report described the following events surrounding Freeman's request for nitroglycerin on March 21, 2008:

> Detention Officer Mike Bowen contacted me via booking desk intercom and advised that Tim Freeman was asking for a nitro tablet. Freeman's nitro tablets had previously been moved to the supervisor's office. I retrieved the bottle of nitro from the supervisor's office and immediately went to D pod. I asked Freeman if he was having chest pain. Freeman said th[at] he was having chest pain. I gave Freeman one nitro tablet. I asked him how long he had been

>having chest pain, he said he had chest pain four different times but this one was the worst so he asked for the nitro. Approximately 7 minutes later, Bowen advised that Freeman was asking for a second nitro tablet. At this time Detention Officer Lynn Adams escorted Freeman to medical for assessment.

Def.'s App. at 25 (alteration added).  The supervisor sent a copy of her report to the medical unit. Two days later, Freeman again requested nitroglycerin.  In a written report, a supervising officer described the surrounding events as follows:

>Around 0325 I was sitting in master control when Officer Tim Adland received a call from D-4. Officer Adland answered the call and asked, "What is your emergency[".] The inmate stated I need nitro. I knew right when I heard that it was Tim Freeman requesting his nitro. . . . I then went to the supervisor office and retri[e]ved his nitro and then went to booking to get a small medicine cup. I arrived to D pod around 0330 . . . . I then poured one nitro into the med cup and gave to Freeman to take[.] At 0335 I asked Freeman if he was starting to feel better. Freeman stated "I think I can sleep now[."] . . . It should be noted while this was going on I never saw Freeman grab at his chest or was he short of breath.

*Id.* at 27 (alterations added). The supervisor sent a copy of the report to the medical unit. On March 26, a third supervisor dispensed nitroglycerin to Freeman and wrote the following report:

>I was contacted by Housing Control Officer John Wilson. Wilson stated that Freeman, who is housed in G10, was requesting a Nitro pill due to chest pain. When I arrived to G Pod, Wilson went to Freeman's cell with this officer. . . . Freeman said that he was having chest pain as I placed a pill in his hand. Freeman put the pill in his mouth . . . . I instructed Freeman to let us know if his chest pain continued and if he needed more Nitro.
>   At the time of this report, Freeman has not requested any more Nitro pills and appears to be resting, per Housing Officer Jerry Schomer.

*Id.* at 28. A copy of the report was sent to the medical unit.

At some point in March, Dr. Thomas discussed with Dr. Pritza the need for beta-blocker treatment for Freeman. On March 26, Dr. Pritza reviewed Freeman's medical records and determined that, "beta blocker therapy with Atenolol at an appropriate dose was warranted due to Mr. Freeman's history of coronary artery disease." *Id.* at 5. The doctor believed that beta-blocker therapy "was indicated to help prevent any cardiovascular complications such as angina." *Id.* at 13. Freeman was transferred out of the jail two days later.

Freeman was again admitted to the jail on July 22, 2009.  At the time of admission, he was taking 10 mg daily of Bystolic, another beta-blocker, to treat his hypertension and coronary artery disease.

Dr. Pritza testified that on various occasions he had examined Freeman and had communicated with Dr. Thomas regarding use of beta-blockers for Freeman.  After reviewing Freeman's medical records, including those of other health care providers with Cardiovascular Specialists, Dr. Pritza concluded, "In my opinion, Dr. Thomas' medical treatment of Mr. Freeman was appropriate." *Id.* at 5.

## III.  Analysis

### A.  Atenolol Prescription

Freeman essentially claims Dr. Thomas was deliberately indifferent to his serious medical need in violation of his Eighth Amendment rights, when the doctor prescribed Atenolol for him from June 26 through July 16, 2007.  Freeman contends that in prescribing the Atenolol during that period, the doctor was ignoring the treatment plans of Freeman's cardiologists.

As grounds for summary judgment, Dr. Thomas contends that in prescribing Atenolol for Freeman's high blood pressure, he was exercising his professional independent judgment in determining the appropriate medical treatment plan.

Under the Eighth Amendment's proscription against "cruel and unusual punishments," prison officials must give inmates medical care.  *Hines v. Anderson*, 547 F.3d 915, 920 (8th Cir. 2008) (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)).  To establish a claim that prison officials' failure to provide medical care violates their constitutional rights, the plaintiffs must show "(1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Id.* (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)); citing *Farmer v. Brennan*, 511 U.S. 825 (1994)).  An official has not violated the Eighth Amendment if he acted reasonably, though through hindsight is found to have acted incorrectly.  *Id.*  For this reason, medical malpractice does not necessarily violate the Eighth Amendment.  *Id.* (citing *Dulany*, 132 F.3d at 1243).  Furthermore, inmates "have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Id.* (quoting *Dulany*, 132 F.3d at 1239)); *accord Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).

The parties agree, and the Court finds, that Freeman's coronary artery disease and related heart problems constitute a serious medical need. Dr. Thomas asserts that Freeman has not pointed to sufficient evidence to establish that the doctor acted in deliberate indifference to this medical need.

Freeman argues that the combination of Dr. Thomas's ignoring the orders of the cardiac specialists by prescribing Atenolol from June 26 to July 16, 2007, and his alleged failure to sufficiently monitor Freeman's heart rate during the period at issue indicates the doctor failed to exercise professional medical judgment in changing the course of Freeman's treatment and "suggests Dr. Thomas either blatantly ignored or recklessly disregarded a substantial risk of serious harm to Mr. Freeman due to his bradycardia." (Pl.'s Br. Res. Def. Mot. Summ. J. at 6.) Freeman further asserts that the evidence shows Dr. Thomas ignored his attempts through inmate communication forms to call the problem to the doctor's attention. In support of his arguments, Freeman relies on *Roberson v. Bradshaw*, 198 F.3d 645 (8th Cir. 1999) (reversing grant of summary judgment in physician's favor on claim of deliberate indifference to inmate's serious medical need).

Dr. Bodnar's June 19, 2007, plan and recommendation for Freeman is silent concerning how soon after the inmate's heart rate returned to an acceptable range, Dr. Thomas should or could again prescribe a beta-blocker for Freeman, and what amount of beta-blocker should or could be prescribed for him. Dr. Mahmood's discharge summary was also silent concerning these issues.

Viewing the record in the light most favorable to Freeman, the Court finds no evidence exists or supports a reasonable inference, that Dr. Thomas was told by any doctor not to prescribe beta-blockers to Freeman at any time after he left Mercy Hospital on June 20, 2007, and specifically not to prescribe a beta-blocker during the period June 26 through July 16. Cutting against such an inference is the July 17, 2007, Cardiovascular Specialists office note showing that Dr. Bodnar recommended that a patient with Freeman's "underlying coronary disease maintain on beta-blocker therapy," and that if "his blood pressure and heart rate tolerates beta-blocker, this medication should be considered a necessary component of his cardiac medical regimen." (Def.'s App. at 18.) Dr. Bodnar specifically recommended that Freeman "be on beta-blocker therapy, as adjusted by Dr. Thomas." *Id.* The Court finds that no fact finder could

10

reasonably infer, based on the undisputed evidence, that Dr. Thomas ignored the order of cardiologists when he prescribed Atenolol for Freeman from June 26 to July 16, 2007.

The mere fact that Dr. Thomas' June 26 prescription of 100 mg twice daily of Atenolol was greater than the 25 mg daily of Atenolol later recommended by Dr. Bodnar's office does not alone support a claim of deliberate indifference.  Physicians' disagreement over the proper treatment is not actionable under § 1983, *see Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995), and prison physicians are free to exercise their independent medical judgment, *see Hines*, 547 F.3d at 920.  Furthermore, even if Freeman could establish that Dr. Thomas acted negligently in prescribing 100 mg of Atenolol, mere negligence or medical malpractice does not necessarily violate the Eighth Amendment.  *See Estelle*, 429 U.S. at 106; *Hines*, 547 F.3d at 920. To the extent that Freeman's contention amounts to a disagreement with Dr. Thomas' treatment decisions, the mere disagreement is insufficient to support a claim of deliberate indifference. *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008).

Furthermore, the record shows that Dr. Thomas did not ignore Freeman's complaints about the beta-blocker prescription.  *Compare Roberson*, 198 F.3d at 648 (stating doctor ignored inmate's complaints of serious adverse reaction to medication and intentionally kept him on that medication; noting that the doctor denied that the inmate made any such complaint and did not claim that he considered the inmate's adverse reactions and concluded that the medication was nonetheless the appropriate medicine to prescribe).  After Freeman wrote the first inmate communication form on July 11, 2007, complaining about the prescription, Dr. Thomas tried to set an appointment for Freeman to talk with him about the medication and his chronic heart condition, but the inmate refused to see the doctor.  Dr. Thomas then discontinued the prescription on July 16, and he consulted with doctors at Cardiovascular Specialists to get an update on treatment recommendations for Freeman.

Between June 26 and July 16, jail medical staff checked Freeman's heart rate three times, but the inmate asserts his heart rate should have been monitored more frequently.  Although the Cardiovascular Specialists office note dated July 17, 2007, states that the jail's "staff was instructed to check his blood pressure and pulse every other day," the record contains no evidence indicating that Dr. Thomas or his staff received a similar instruction before July 17. (Def.'s App. at 18.)

11

In the face of medical records showing that Dr. Thomas provided treatment and responded to Freeman's complaints about the prescription, and in the face of Dr. Pritza's affidavit indicating that Dr. Thomas provided adequate medical care to the inmate, Freeman cannot create a fact question by merely stating he did not feel he received adequate treatment. *See Dulany*, 132 F.3d at 1240 (affirming district court's granting of summary judgment to prison officials on claim of deliberate indifference to a serious medical need; "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment").

The Court finds the evidence and the reasonable inferences are insufficient to establish that Dr. Thomas was deliberately indifferent to Freeman's serious medical need when he prescribed Atenolol for him from June 26 to July 16, 2007, or any other time relevant in this case. Viewing the evidence and all justifiable inferences in the light most favorable to Freeman, the Court finds that no genuine issues of material fact are in dispute, and Dr. Thomas is entitled to judgment as a matter of law on this claim. The Court respectfully recommends that Defendant's Motion for Summary Judgment and Amended Motion for Summary Judgment be granted on this claim.

### B. Nitroglycerin Tablets

Freeman next claims that Dr. Thomas was deliberately indifferent to his serious medical need for nitroglycerin tablets when the doctor changed the procedure by which Freeman could get the tablets for his angina, causing the inmate to have to wait several minutes to receive pain relief.

The parties agree, and the Court finds, that Freeman's angina constituted a serious medical need. Dr. Thomas asserts that as a matter of law he is entitled to summary judgment because his decision to change the protocol for administering nitroglycerin tablets to Freeman was not an act of deliberate indifference but constituted the exercise of his professional judgment. He asserts, and Freeman does not deny, that in March 2008, before the protocol was changed, jail staff noted that Freeman was taking the nitroglycerin tablets for heart palpitations and on a frequent basis without notifying medical staff. The doctor testified that his medical concern "with Mr. Freeman taking his nitroglycerin without necessity was severe, rapid drop in

blood pressure which could cause fainting or more seriously an acute heart attack." (Def.'s App. at 2.) Also, the doctor added, "if the patient was taking nitroglycerin in an unsupervised fashion, there was no way to know if something more serious was occurring." *Id.* Dr. Thomas further contends he is not responsible for any delay that might have been caused by the staff in delivering the pills to Freeman's cell.

Freeman asserts that when Dr. Thomas decided to remove Freeman's nitroglycerin pills from his person, the doctor was "ignoring the orders of Mr. Freeman's cardiac specialists." (Pl.'s Br. Res. Def.'s Mot. at 10.) In support, Freeman points to Dr. Bodnar's July 17, 2007, statement that Freeman "has sublingual nitroglycerin, which he should keep on his person." *Id.* (quoting Def.'s App. at 18).

It is undisputed that Dr. Thomas' medical concerns about the manner in which Freeman was ingesting the nitroglycerin pills arose in March 2008, and the doctor based his protocol change on Freeman's actions at that time. No evidence indicates that in July 2007, when Dr. Bodnar made her recommendation, Freeman was taking the nitroglycerin tablets for heart palpitations and on a frequent basis without notifying medical staff, as he was in March 2008 when Dr. Thomas' medical concerns arose.

The Court finds the evidence is insufficient to establish that Dr. Thomas was deliberately indifferent to Freeman's serious medical need when he changed the protocol for Freeman to receive nitroglycerin tablets. Dr. Thomas was free to exercise his independent medical judgment. *Hines*, 547 F.3d at 920. Viewing the facts and inferences in the light most favorable to Freeman, the Court finds that there is insufficient evidence from which a jury could reasonably infer that Dr. Thomas disregarded Freeman's serious medical needs in violation of his Eighth Amendment rights on this claim. The Court respectfully recommends that Defendant's Motion for Summary Judgment and Amended Motion for Summary Judgment be granted on this claim.

## IV. Recommendation and Order

IT IS RESPECTFULLY RECOMMENDED, under 28 U.S.C. § 636(b)(1)(B), that Defendant's Motion for Summary Judgment (Clerk's No. 26) and Amended Motion for Summary Judgment (Clerk's No. 35) be **granted** and judgment entered in favor of Defendant Dr. Thomas, because he was not deliberately indifferent to any of Plaintiff's serious medical needs.

IT IS ORDERED that the parties have until May 10, 2010, to file written objections to this Report and Recommendation, under 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990) (per curiam); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993). The Court will freely grant such extensions. *Martin v. Ellandson*, 122 F. Supp. 2d 1017, 1025 (S.D. Iowa 2000). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and set forth the basis for such objections. *See* Fed.R.Civ.P. 72; *Thompson*, 897 F.2d at 357; *Martin*, 122 F. Supp. 2d at 1025. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Newton*, 259 F.3d 964, 966 (8th Cir. 2001) (citing *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994)).

**IT IS SO ORDERED**.

Dated this 21st day of April, 2010.

_____
CELESTE F. BREMER
UNITED STATES MAGISTRATE JUDGE